In re **TERAZOSIN HYDROCHLORIDE ANTITRUST LITIGATION.**

No. 99–MDL–1317.

United States District Court, S.D. Florida.

April 8, 2004.

Mitchell Wayne Berger, Jeffrey Scott Wertman, Candice Diane Tobin, Berger Singerman, Fort Lauderdale, FL, Daniel Berger, David Sorensen, Eric L. Cramer, Berger & Montague, P.C., Philadelphia, PA, David Boies, Boies, Schiller & Flexner, Armonk, NY, Joseph C. Kohn, Kohn, Swift & Graf, Philadelphia, PA, Jack Staph, Jack, Staph & Associates, Pepper Pike, OH, Richard Drubel, Boies, Schiller & Flexner, Hanover, NH, Samuel D. Heins, Daniel E. Gustafson, Karla M. Gluck, Heins, Mills & Olson, Minneapolis, MN, Robert Scott Palmer, C. Oliver Burt, III, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, West Palm Beach, FL, Barry S. Taus, Bruce E. Gerstein, Stephen H. Schwartz, Garwin, Bronzaft, Gerstein & Fisher LLP, New York City, Aubrey

B. Calvin, Houston, TX, David P. Smith, Percy, Smith, Foote & Gadel, Alexandria, LA, John Gregory Odom, Stuart E. Des Roches, Randall Acree, Odom & Des Roches, New Orleans, LA, Mark S. Armstrong, Squire, Sanders & Dempsey, Houston, TX, Scott Eliot Perwin, Kenny, Nachwalter, Seymour, Arnold, Critchlow & Spector, Miami, FL, Douglas E. Patton, Dewsnup, King & Olsen, Salt Lake City, UT, Bradley Joseph Gross, Barrett, Gravante, Carpinello & Stern, Fort Lauderdale, FL, Nicholas A. Gravante, Jr., Ryan Kees Higgins, Barrett, Gravante, Carpinello & Stern, New York City, Michael Straus, Straus & Boies, Birmingham, AL, Michael I. Endler, Barrett, Gravante, Carpinello & Stern, Albany, NY, Mary Boies, Boies & McInnes, Bedford, NY, for plaintiff.

Daniel Small, Cohen, Milstein, Hausfeld & Toll, Washington, DC, pro se.

Paul Alan Shelowitz, Akerman, Senterfitt & Eidson, Miami, FL, Robert Alexander Milne, Michelle Wilhelm, Paul Olszowka, Joseph Angland, Dewey Ballantine, New York City, Wayne A. Cross, M. Victoria Bayoneto, Brendan G. Woodard, Sean Douglas Burke, Dana Evans Foster, White & Case, New York City, Elizabeth J. Basten, Clark Hill, Detroit, MI, Jay Brian Shapiro, Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, Miami, FL, Gerson A. Zweifach, Kevin M. Downey, Kirsten M. Schimpff, Kathleen L. Jennings, Manish K. Mital, Williams & Connolly, Washington, DC, Jon W. Zeder, Ferrell, Schultz, Carter & Fertel, Miami, FL, Kevin Clark Maclay, Jones, Day, Reavis & Pogue, Washington, DC, Stephen E. Morrissey, Jeffrey I. Weinberger, Stuart N. Senator, David M. Rosenzweig, Rohit K. Singla, Munger, Tolles & Olson, Los Angeles, CA, Andrew J. McGuinness, Dykema Gossett, Ann Arbor, MI, Laura J. Schumacher, Abbott Laboratories, Abbott Park, IL, Barbara B. Smithers, Orlando, FL, for defendant.

## ORDER GRANTING INDIRECT PURCHASER PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION OF STATE–WIDE CLASSES

SEITZ, District Judge.

THIS CAUSE is before the Court upon the Indirect Purchaser Plaintiffs' ("IPPs") Motions for Class Certification of a State–Wide Class of End–Payers in: Alabama [DE–453], California [DE–452], the District of Columbia [DE–451], Florida [DE–450], Illinois [DE–464], Kansas [DE–463], Maine [DE–462], Michigan [DE–461], Minnesota [DE–460], Mississippi [DE–459], Nevada [DE–458], New Jersey [DE–457], New Mexico [DE–455], New York [DE–456], North Carolina [DE–454], North Dakota [DE–465], South Dakota [DE–466], West Virginia [DE–467], and Wisconsin [DE–468]. Upon review of the Motions and supporting memoranda, the Defendants' joint opposition, Indirect Purchaser Plaintiffs' Reply, the parties' supplemental briefings, and oral argument, the Court will GRANT the Indirect Purchasers' Motions for Class Certification of a State–Wide Class of End Payers with the exception of the Motion for Class Certification in the District of Columbia [DE–451], which is DENIED, and the Motion for Class Certification in New Jersey [DE–457], which is DENIED AS MOOT.[1]

## I. Factual Background

This case arises from Indirect Purchaser Plaintiffs' assertion of antitrust injury and unjust enrichment in nineteen states, based on the allegedly anti-competitive conduct of Defendants Abbott Laboratories ("Abbott"), Geneva Pharmaceuticals, Inc. ("Geneva"), and Zenith Goldline Pharmaceuticals, Inc. ("Zenith")[2]. Since 1987, Abbott has been

---

1. On September 11, 2002, this Court issued an Order Granting In Part and Denying In Part Defendants' Motion to Dismiss Certain State Counts of the Indirect Purchaser Plaintiffs' Third Amended Coordinated Complaint [DE–873]. In that Order, this Court dismissed with prejudice the claims of the New Jersey indirect purchasers. *Id.* at p. 7. Accordingly, the motion to certify a class of indirect purchasers in New Jersey, which

was filed a year before the Court's dismissal of their claims, must be denied as moot.

2. Zenith, now known as Ivax Pharmaceuticals, Inc., entered into a settlement with Indirect Purchaser Plaintiffs in 2002. The Settlement Agreement was preliminarily approved by this Court on August 23, 2002 [DE–858]. Following a fairness hearing, the Court finally approved the set-

exclusively manufacturing and marketing the chemical compound terazosin hydrochloride under the brand name "Hytrin," a drug used for the treatment of hypertension and enlarged prostate. Both Geneva and Zenith are generic drug manufacturers that developed generic versions of Hytrin for sale in the United States. Indirect Purchaser Plaintiffs assert that two 1998 agreements, one between Abbott and Geneva and another between Abbott and Zenith, violated the laws of the various states and resulted in delayed domestic competition for the sale of terazosin hydrocholoride. Indirect Purchaser Plaintiffs further allege that Abbott unlawfully extended its monopoly power over the market for terazosin hydrochloride by misusing its Hytrin patents, ignoring certain regulations issued by the Food and Drug Administration ("FDA"), and engaging in baseless patent litigation against Geneva and Zenith. The relevant facts of the case, which firmly situate this case in the complex intersection of antitrust and patent law, are as follows:

### A. The Regulatory Framework and Abbott's Patent Litigation

Under federal law, FDA approval is required before a company may begin selling a new drug in interstate commerce in the United States.[3] Applications for FDA approval can be filed as either new drug applications ("NDA") or abbreviated new drug applications ("ANDA"). If FDA approval is granted pursuant to an NDA, the drug manufacturer is issued a new patent which allows the patent owner to exclude others from making, using, or selling the drug in the United States for the duration of the patent. Upon approval by the FDA, information regarding any claimed patents are listed in a publication known as the Orange Book.

As a patent nears expiration, generic manufacturers often seek to market the generic version of brand name drugs that the FDA previously approved as an NDA. In that case, the Drug Price Competition and Patent Term Restoration At of 1984, 21 U.S.C. §

§ 355 ("the Hatch–Waxman Act") permits the generic drug manufacturers to seek expedited FDA approval by filing an ANDA pursuant to 21 U.S.C. § 355(j). While the NDA applicant must submit safety and efficacy studies for every proposed new drug, ANDA applicants may rely on the safety and efficacy data already filed with the FDA by the manufacturer of the equivalent brand name drug.

After a generic applicant has submitted its ANDA to the FDA, it must file a patent certification with respect to each patent claiming the listed drug (or a method of using the listed drug) of which the applicant is aware. In so doing, the applicant must certify that: (1) the patent information has not been filed with the FDA; (2) the underlying patent is expired; (3) the patent will expire, identifying the expiration date; or (4) the patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug. If the applicant certifies either that the patent information has not been filed or that the patent is expired, the FDA approval of the ANDA can proceed immediately. If the patent has not yet expired, the ANDA will not be approved until after the expiration date of the relevant patent. However, if the certification falls into the fourth category (known as a "paragraph IV certification"), the applicant must notify the patent holder, who then has the statutory right to bring suit for patent infringement, which will automatically delay approval of the ANDA for a period of thirty months.

Abbott holds a number of patents permitting it to manufacture and market drugs containing the chemical compound terazosin hydrochloride. Specifically, between 1977 and 1996, the United States Patent and Trademark Office ("the PTO") issued Abbott seven different patents covering various terazosin formulations. According to Indirect Purchaser Plaintiffs, prior to March 1995, only three of Abbott's patents relating to Hytrin had been submitted to the FDA for

---

tlement and entered final judgment as to Ivax on December 19, 2002 [DE–913].

**3.** The regulatory framework governing FDA approval for drugs, and the significance of the

patent system, is more thoroughly explained in the Eleventh Circuit Court of Appeals' decision in *Valley Drug Co., et al. v. Geneva Pharm., Inc., et al.*, 344 F.3d 1294, 1296–1300 (11th Cir.2003).

listing in the Orange Book. Indirect Purchaser Plaintiffs contend that Abbott's other claimed patents are invalid "add-on" patents. Add-on patents, as Indirect Purchaser Plaintiffs explain, are those that are improperly obtained and listed in the Orange Book with expiration dates long after the expiration date of the patent for the active ingredient. The purpose of listing such an "add-on" patent on the eve of an anticipated ANDA application, as Indirect Purchaser Plaintiffs' allege Abbott did, is to be able to initiate a patent infringement suit against the ANDA applicant and to trigger the automatic thirty-month stay under the Hatch–Waxman Act. It can, therefore, be used as a blockade by the brand-name drug manufacturer to delay generic competition.

Because of Hytrin's success in the pharmaceutical market,[4] in the early 1990s, several generic drug makers including Geneva and Zenith began taking steps to develop generic versions of Hytrin that contained the same active chemical components but different inactive ingredients. For instance, between 1993 and 1996, Geneva filed four ANDAs based on Abbott's NDA for Hytrin, each time making paragraph IV certifications. In September 1994, Abbott exercised its statutory right to sue Geneva for patent infringement and initiated several actions against Geneva in the United States District Court for the Northern District of Illinois. The ensuing litigation, as alleged by Indirect Purchaser Plaintiffs, delayed Geneva's efforts to market its own generic drug for an indefinite period of time pending resolution of the parties' ongoing patent disputes. Abbott also instituted legal actions against Zenith in 1994 and 1995, after it learned that Zenith had filed an ANDA for a terazosin hydrochloride drug. Therefore, from 1994 onwards, Abbott found itself involved in concurrent disputes with both Geneva and Zenith, as well as other generic manufacturers, over the validity of its Hytrin patents while Geneva and Zenith competed with each other to bring the first generic terazosin hydrochloride drug to market.

### B. The Abbott–Zenith and Abbott–Geneva Agreements

In late March and early April 1998, Abbott entered into separate confidential settlement agreements with Zenith and Geneva, its two fiercest potential competitors, to resolve the ongoing patent litigation. Under the Abbott–Zenith agreement, entered into on March 31, 1998, Zenith agreed to accept $3 million to join Abbott in dismissing the pending actions between the two parties, as well as an additional $6 million per quarter to "not sell, offer for sale, donate, or otherwise commercially distribute in the United States any Terazosin Hydrochloride Product." Zenith also obtained Abbott's permission to market such products once generic competition began. Similarly, pursuant to the April 1, 1998 Abbott–Geneva agreement, Geneva agreed to accept Abbott's payment of $4.5 million per month to refrain from selling any generic terazosin hydrochloride drug, including a terazosin capsule for which Geneva had obtained FDA approval in March 1998, until the earlier of: (1) the date on which another drug maker sold a generic version of Hytrin in the United States; or (2) the date on which Geneva received a final, unappealable judgment that its proposed generic tablet did not infringe Abbott's patents.

As a result of these agreements, Abbott exclusively sold the only terazosin hydrochloride drug available in the United States until August 1999. The Abbott–Zenith and Abbott–Geneva agreements terminated on August 13, 1999, in response to a Federal Trade Commission investigation of the agreements which resulted in a consent settlement. On August 13, 1999, Geneva began to market its terazosin capsules, the first generic terazosin hydrochloride drug in the United States. Other generics, such as Mylan's terazosin capsule introduced in February 2000, soon followed. While Abbott raised its average wholesale price for Hytrin capsules by 11.8% in the nine months following Geneva's entry into the market, Geneva's capsules were sold

---

4. Hytrin proved to be a highly profitable drug for Abbott, generating $481 million in sales for Abbott in 1998 alone. This figure constituted approximately 20% of Abbott's net sales of pharmaceutical products that year, and made Hytrin the 33rd best-selling prescription drug in the United States by dollar volume.

at a price approximately 46% lower than Hytrin. Further generic penetration into the market caused the generic average wholesale price to drop even further to less than 16% of Abbott's Hytrin price by April 2000.

## II. The Indirect Purchaser Plaintiffs' Class Certification Motions

As asserted in their Fourth Amended Complaint, Indirect Purchaser Plaintiffs seek damages from Defendants based on anti-trust[5] and unjust enrichment theories. Specifically, Indirect Purchaser Plaintiffs allege that the Abbott–Zenith and Abbott–Geneva agreements evidence a conspiracy to restrain trade in violation of the various state statutes.[6] Indirect Purchaser Plaintiffs also allege that Abbott's conduct in filing "add-on" patents, pursuing frivolous patent litigation, and entering into anti-competitive agreements with their primary generic competitors delayed generic entry in the market, and served to extend Abbott's monopoly over the domestic market for terazosin hydrochloride. Finally, Indirect Purchaser Plaintiffs contend that the delayed generic entry into the market resulted in Defendants being unjustly enriched, in that: (a) Abbott derived excess profits from the overcharges that Hytrin purchasers paid during the period of generic foreclosure; and (b) Geneva was paid substantial amounts to delay marketing its generic terazosin capsule under the Abbott–Geneva agreement of April 1998.

On September 4, 2001, Indirect Purchaser Plaintiffs moved for certification of nineteen state-wide classes of "end-payers" in Alabama, the District of Columbia, California, Florida, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin [DE–450 through 468]. Indirect Purchaser Plaintiffs define "end -payers" as those consumers and third-party payers[7] who bore the economic risk for purchases of terazosin. Invoking the interest of judicial economy, Indirect Purchaser Plaintiffs have moved to certify the following class:

> All persons and entities who or which have at any time from October 15, 1995 to June 30, 2002[8] paid all or part of the purchase price of Hytrin or its AB-rated generic bioequivalents other than for resale, in [state] or via mail for residents of [state]. Excluded from the Class are the Defendants, their officers and directors, their direct and indirect parent and subsidiary corporations and their officers and directors; government entities; entities that purchased Hytrin and its generic bioequivalents for resale, to the extent of such purchases for resale; direct purchasers of Hytrin and its generic bioequivalents from Defendants, to the extent of such direct purchases; and indirect purchasers who

5. Under United States Supreme Court precedent, indirect purchasers do not have standing to seek damages under the federal antitrust law. *See Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *see also Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). However, in the instant case, each proposed indirect purchaser state class is proceeding under an *Illinois Brick* repealer statute, or under unfair trade practices legislation.

6. As will be addressed in section III.C.1 below, the various state statutes under which Indirect Purchaser Plaintiffs are proceeding require the same elements for claims of monopolization and restraint of trade as the federal antitrust laws.

7. Third-party payers, sometimes referred to here as TPPs, can be further categorized into: (1) traditional insurers, such as proposed class representatives Cobalt, Blue Cross/Blue Shield of Michigan, and Blue Cross/Blue Shield of Ala-

bama, and (2) self-funded employer health benefit plans ("SFPs") that act as insurers for their own employees.

8. The Court notes that this proposed class definition represents a slight modification of the original definition suggested by the Indirect Purchaser Plaintiffs. Specifically, the current proposal provides a June 30, 2002 end date for the class period. When asked about the significance of this date at the March 12, 2004 oral argument, Indirect Purchaser Plaintiffs responded that it does not have any particular significance, but that it represents a reasonable ending date for the class period. While some residual damages may have continued to accrue after that date, Indirect Purchaser Plaintiffs believe that prices had stabilized by then. Defendants have not asserted any particular opposition to the June 30, 2002 date.

suffered no economic injury as a result of Defendants' allegedly unlawful conduct.[9]

*See* IPPs.' Response to Defs.' Submission Regarding Alternative Indirect Purchaser Class Definitions, filed on March 2, 2004 [DE–1085] at p. 2. As Indirect Purchaser Plaintiffs bear the burden of satisfying the requirements for a class action under Fed. R.Civ.P. 23, *see Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir.1984), the Court will address those provisions in turn.

## III. Discussion

### A. Standing

█ It is well-settled in the Eleventh Circuit that prior to the certification of a class, and before undertaking any of the analysis under Rule 23, the district court must determine that at least one named class representative has Article III standing to raise each class claim. *Wolf Prado–Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir.2000); *see also Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir.1987) ("[A]ny analysis of class certification must begin with the issue of standing."). Indeed, "[o]nly after the court determines the issues for which the named plaintiffs have standing should it address the question whether the named plaintiffs have representative capacity, as defined by Rule 23(a), to assert the rights of others." *Griffin*, 823 F.2d at 1482.

Under the principles of standing, "a plaintiff must allege and show that he personally suffered injury." *Id.* (*see Payne v. Travenol Lab., Inc.*, 565 F.2d 895, 898 (5th Cir.) ("To meet the requirement for standing under Article III, a plaintiff must establish either

that the asserted injury was in fact the consequence of the defendant's action or that the prospective relief will remove the harm.") (citation omitted), *cert. denied*, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978)). Thus, to satisfy this requirement, the Court must determine that the class representative is "part of the class and possess[es] the same interest and suffer[ed] the same injury as the class members." *Prado–Steiman*, 221 F.3d at 1279 (citing *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Ordinarily, it is not sufficient that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, "each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."[10] *Prado–Steiman*, 221 F.3d at 1280 (citing *Griffin*, 823 F.2d at 1483).

The classes proposed by Indirect Purchaser Plaintiffs include both third-party payers and individual consumers. As will be addressed more fully in connection with the Court's Rule 23 analysis, Defendants object to the inclusion of both types of purported end-payers in the same class, contending that the claims of insurance companies are atypical of the individual consumers' claims and that antagonistic interests exist between the two groups. *See* Section III.B.4(a).[11] While these arguments were raised as challenges to typicality and adequacy of representation, and not as part of an Article III standing analysis, the Court recognizes that the issues

---

**9.** The clear exclusion of "indirect purchasers who suffered no economic injury as a result of Defendants' allegedly unlawful conduct" also represents a modification of the original class definition. As will be more fully discussed below, this exclusion eliminates some of the potential conflicts that may arise in the context of the Rule 23(a)(4) analysis.

**10.** Although the Eleventh Circuit instructs that each claim must be analyzed separately for standing purposes, in this case, the interwoven facts that give rise to both Plaintiffs' antitrust and unjust enrichment claims indicate that any class representative who has Article III standing for one claim will necessarily have standing for the

other. *See* IPPs' Mot. at p. 45 ("The same operative facts which form the basis of each of the state Classes' claims based upon antitrust theories form the basis of the Classes' claims for unjust enrichment."). Indeed, in their arguments on standing and typicality, Defendants have failed to distinguish between the antitrust and unjust enrichment claims.

**11.** Because many of the elements relevant to class certification overlap with one another, the Court will often cross-reference other sections in this Order. For the convenience of the parties, the Court has appended to the end of this Order an index listing the pages on which each subsection begins.

of standing and typicality are closely aligned. *See Prado–Steiman*, 221 F.3d at 1279 (stating that "it should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class"). As discussed in Section III.B.4(a) below, Indirect Purchaser Plaintiffs have demonstrated the requisite nexus between the claims of the third-party payers and the individual consumers, and the Court has concluded that no conflicts exist between the two types of end payers that would preclude class certification. With these principles in mind, the Court assesses each proposed class to determine whether at least one named class representative, whether a third-party payer or an individual consumer, has Article III standing to raise the classes' claims of antitrust violations and unjust enrichment.

### 1. Named Third–Party Payer Class Representatives

#### a. Cobalt

■ As an initial matter, the Court notes that in an Order dated September 11, 2002, this Court concluded that Cobalt (formerly known as United Wisconsin Services, Inc. or "UWSI") had Article III standing to assert the class claims in the states at issue. [DE–873]. Specifically, the Court held that "[d]espite Defendants' arguments to the contrary, UWSI is not limited to pursuing a claim under the laws of Wisconsin only." *Id.* at p. 6. This ruling was made in the context of Defendants' Motion to Dismiss Certain State Counts of the Indirect Purchaser Plaintiffs' Third Amended Coordinated Complaint. However, it is worth noting that with respect to standing requirements in general, the required showing depends on the stage of the litigation at which the standing issue is being decided. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because this case has proceeded far beyond the pleading stage, the Court must now look beyond the allegations of the complaint and assess whether record evidence supports a finding that Cobalt has Article III standing. *Id.*

Cobalt purports to be a named class representative in fifteen states—California, Florida, Illinois, Kansas, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin. The record evidence reflects that during the class period, Cobalt reimbursed the following number of Hytrin and terazosin prescriptions in each state: 274 in California; 1,518 in Florida; 648 in Illinois; 95 in Kansas; 369 in Minnesota; 28 in Mississippi; 137 in Nevada; 22 in New Mexico; 29 in New York; 342 in North Carolina; 3 in North Dakota; 23 in South Dakota; 47 in West Virginia;[12] and 79,429 in Wisconsin. *See* Defs.' Opp'n, at Ex. 44. There is no record evidence reflecting whether Cobalt made any purchases (or reimbursed any purchases) of Hytrin and/or generic terazosin in Michigan.

Defendants do not dispute that Cobalt, a Wisconsin corporation whose principal place of business is in Wisconsin, may serve as a named class representative in Wisconsin. *See* Defs.' Opp'n, at p. 51; *see also* Compl. at ¶ 13. Defendants do assert, however, that Cobalt lacks standing in any state other than Wisconsin. *Id.* at 50–53. Specifically, applying the "most significant relationship" test, Defendants conclude that any injury suffered by Cobalt occurred in Wisconsin, thereby making Cobalt's claims subject to Wisconsin law. *Id.* In support of this argument, Defendants point out that: (1) Cobalt is a Wisconsin corporation with its principal place of

12. Defendants, in a footnote devoid of any citations, also challenge Cobalt's standing in South Dakota and West Virginia. Specifically, Defendants argue that because those states' monopolization claims rest on allegations regarding Abbott's unilateral conduct between 1995 and 1998, and Cobalt made no purchases in those states during that time period, Cobalt lacks standing either individually or as a representative of the class. *See* Defs.' Opp'n, at p. 51, n. 26. Defendants have failed to provide any support for this argument. As will be discussed in more detail under the typicality requirement, there is no requirement under Rule 23 that the claims of the named class representatives be identical in substance or scope to those of the class members, either for standing or for typicality purposes. *See* Section III.B.3 below. Therefore, the mere fact that Cobalt's reimbursements were not made during the same time period as the class' allegations does not defeat Cobalt's standing in those states.

business in Wisconsin; (2) the vast majority of Cobalt's claims are based on transactions that occurred in Wisconsin; and (3) the reimbursements giving rise to Cobalt's claims in the various states are based on transactions that occurred in Wisconsin. *Id.* at p. 51.

While Defendants' claim is premised on the notion that the state of purchase is the state where Cobalt reimburses the claims, Defendants have failed to provide any support for this argument. Indeed, other courts have recognized the propriety of basing class eligibility on the state where the patient resides, as opposed to the state where the pharmacy or insurance company is located. *See generally In re Cardizem,* 200 F.R.D. 297 (E.D.Mich.2001); *see also In re Lorazepam & Clorazepate Antitrust Litig.,* 205 F.R.D. 369, 396 (D.D.C.2002) (holding that "the plaintiffs' choice to base class eligibility upon the [third-party payer] class members' plan members' states of residence [is] fair and reasonable because it generally comports with the purposes of the states' antitrust laws.").[13] Accordingly, the Court concludes that Cobalt has standing to assert the claims of the class members in California, Florida, Illinois, Kansas, Minnesota, Mississippi, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, West Virginia, and Wisconsin.

As for Michigan, because Indirect Purchaser Plaintiffs have failed to proffer any evidence establishing that Cobalt reimbursed any claims in that state, Cobalt does not have standing to assert the Michigan class' antitrust and unjust enrichment claims. Cobalt

also lacks standing to assert the class claims in New York. As Defendants correctly argued, because the Donnelly Act's *Illinois Brick* repealer was effective on January 1, 1998 and is not retroactive, and because Cobalt's sole pre–1998 reimbursement in New York occurred in 1996, Cobalt is an inadequate class representative in that state.[14] However, as with Michigan, Cobalt's exclusion as a class representative in New York is not fatal to that state's class certification motion, as another appropriate class representative exists. *See* Section III.A.2(g).

### b. Blue Cross/Blue Shield of Alabama and of Michigan

Blue Cross/Blue Shield of Alabama ("Alabama Blue") and Blue Cross/Blue Shield of Michigan ("Michigan Blue") seek to serve as named class representatives in Alabama and Michigan, respectively.[15] Although there is no specific evidence in the record indicating the amount of reimbursements these two third-party payers made in Alabama and Michigan, there is a sufficient basis for this Court to find that they have standing to pursue the claims of the Alabama and Michigan state classes. First, the parties have engaged in extensive discovery regarding Alabama Blue and Michigan Blue, and Defendants have not contested these third-party payers' standing in Alabama and Michigan. Second, Defendants' own expert, Dr. Daniel Rubenfeld, has repeatedly made reference to the data regarding Alabama Blue and Michigan Blue's reimbursements in those states,

---

**13.** In the *Lorazepam & Clorazepate Antitrust Litig.* case, the United States District Court for the District of Columbia recognized that basing class eligibility on, for instance, the location of the pharmacy where the prescription is filled or the state where the third-party payer resides, would result in "anomalous situations" in which residents of particular states could benefit from other state's statutes although the legislature of their own states intended for no such protections. 205 F.R.D. at 396–97.

**14.** Although Indirect Purchaser Plaintiffs' did not dispute Defendants' interpretation of the Donnelly Act, they did argue that "Defendants' merits-based statute of limitations arguments are improperly raised in this class certification motion." However, the Eleventh Circuit has recognized that "a class representative whose claim is

time-barred cannot assert the claim on behalf of the class." *See Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341 (11th Cir.2001) (citing *Carter v. West Publ'g Co.,* 225 F.3d 1258, 1267 (11th Cir.2000) (reversing class certification because the named plaintiff, whose claim was time-barred, lacked standing to assert the claim)). While the Court reaches no ultimate conclusion on the merits of Defendants' statute of limitations argument, it appears, based on the information presently before the Court, that Cobalt's New York claims cannot proceed.

**15.** On March 2, 2004, Alabama Blue and Michigan Blue moved the Court for permission to be joined as named class representatives in all of the other proposed state classes [DE–1086]. The Court denied their motion as untimely.

and has conducted his own regression analyses using such data. *See* Defs.' Opp'n, at Exs. 42–43. Accordingly, there is a sufficient basis for the Court to conclude that these third-party payers have standing to assert their antitrust and unjust enrichment claims.[16]

### 2. Named Consumer Representatives

#### a. Alabama

Class representative Willie O'Neal purchased Hytrin and generic terazosin hydrochloride from pharmacies in Alabama during the period of 1997–2001. *See* IPPs' Pre–Argument Submission on Class Certification, Ex. G, Tab 1. Mr. O'Neal paid cash out-of-pocket for all of his prescription drug purchases during that period, and paid a lower price for generic terazosin than for Hytrin. *Id.* Mr. O'Neal testified that he switched to generic terazosin as soon as his pharmacist informed him that a generic had become available. *Id.* at 29, 33. Because Mr. O'Neal paid more for Hytrin during the period of alleged generic foreclosure, and later switched to the generic, he has the same interest and has alleged facts sufficient to indicate that he suffered the same injury as the purported class.

#### b. California

As to the named consumer class representatives, the record indicates that Victor Scafani and William Mednick both purchased Hytrin and generic terazosin hydrochloride from pharmacies in California during the periods of 1998–2000 and 1996–2002, respectively. See Ex. G, at Tabs 2–3. Mr. Scafani's purchase records indicate that he incurred a $15 co-payment for Hytrin, but paid only a $10 co-payment for generic terazosin hydro-

chloride once it became available. *Id.* at Tab 2. As for Mr. Mednick, pursuant to the terms of his health insurance benefit plan, his co-payments for purchases of Hytrin ranged from $10 to $15, while his co-payments for purchases of the generic drug ranged from $5 or $9 during the relevant period. *Id.* at Tab 3. Both Mr. Scafani and Mr. Mednick, therefore, have the same interest and have alleged facts sufficient to indicate that they suffered the same injury as the purported class.

#### c. District of Columbia

■ As to the proposed District of Columbia class, the sole named class representative, Clarence Reid, does not have Article III standing. While Mr. Reid purchased Hytrin during part of the class period, the record does not indicate that he suffered any injury from Defendants' alleged anticompetitive conduct. *See* Ex. G, at Tab 4. Specifically, Mr. Reid's deposition testimony indicates that under his health insurance benefits plan, he initially incurred a $15 co-payment for Hytrin prescriptions, which subsequently increased to $40 when generic terazosin hydrochloride became available. *Id.* Further, Mr. Reid testified that he never purchased the generic because as of November 1999, shortly after the generic became available, he became asymptomatic and no longer required medication for his prostate. *Id.* at pp. 42–43. There is also no indication that Mr. Reid would have purchased the generic had it been available earlier.[17] Consequently, absent any evidence that he personally suffered an injury attributable to delayed generic entry, Mr. Reid does not have standing to assert any of the claims raised by the District of Columbia class.[18] Because Mr. Reid

16. If the record evidence ultimately reveals that Alabama Blue and/or Michigan Blue do not have standing to assert these claims, the Court may, under Fed.R.Civ.P. 23(c)(1)(C), amend its Order at any time before final judgment.

17. At the hearing held on March 12, 2004, Indirect Purchaser Plaintiffs' counsel posited that evidence exists to support the conclusion that Mr. Reid *would have* switched to the generic had it been available earlier. However, Indirect Purchaser Plaintiffs' counsel admitted that any claim by Mr. Reid under the antitrust laws is too specu-

lative, thereby conceding that Mr. Reid does not have standing to assert any antitrust violations on behalf of the class.

18. In conceding that Mr. Reid does not have standing to assert the antitrust violations on behalf of the class, Indirect Purchaser Plaintiffs suggested that Mr. Reid does have standing for unjust enrichment claims. However, Indirect Purchaser Plaintiffs have failed to demonstrate (either in their submissions or at oral argument) how Mr. Reid, who did not pay any overcharge or suffer any economic damage, has standing to

is the only named class representative, his lack of Article III standing is fatal to the purported District of Columbia class' certification motion.

### d. Florida

As Indirect Purchaser Plaintiffs conceded at the March 12, 2004 hearing, the named individual representative for the proposed Florida class, Antonio Lopez–Souto, does not have Article III standing. Indeed, in his deposition testimony, Mr. Lopez–Souto admitted that the never gave any thought to substituting generic terazosin hydrochloride for Hytrin. *See* Ex. G, at Tab 5, p. 14. However, because Cobalt does have standing in Florida, the standing requirement is met.

### e. Maine

Class representative David Grund purchased Hytrin and generic terazosin from a pharmacy in Maine during the period of 1995–2001. *See* Ex. G, at Tab 6. Pursuant to his health insurance benefits plan, Mr. Grund made co-payments of $10, $20, or $30 during that time period for various pill counts and dosages of terazosin hydrochloride. *Id.* Based on the record evidence, Mr. Grund has standing to assert the claims of the purported class.

### f. Michigan

Class representative Martin Bernstein purchased Hytrin and generic terazosin from a pharmacy in Michigan during the period of 1999–2001. *Id.* at Tab 7. Pursuant to his prescription drug benefits coverage, Mr. Bernstein was initially charged a co-pay of $3, which subsequently increased to $10, for each prescription filled. *Id.* Mr. Bernstein does not recall the specific difference in his co-payment for brand name drugs versus the generic versions, but he does recall that the generic cost him less. *Id.* Typical of the claims of other class members, Mr. Bernstein claims that he was overcharged during the period preceding generic entry into the market. *Id.* at 43. Based on the record evidence, Mr. Bernstein has standing to assert the claims of the purported class.

raise the claims that Defendants were unjustly

### g. New York

Class representatives Albert J. Meyer and Lloyd Latona both purchased Hytrin and generic terazosin from pharmacies in New York, the former from 1998–2001 and the latter from 1994–2001. Mr. Meyer paid cash for Hytrin until 1998, when his wife changed health insurance coverage. *See* Ex. G, at Tab 8. Under the insurance plan, Mr. Meyer paid a $10 co-payment for Hytrin, until he switched to generic terazosin in January 2000 and began paying a $5 co-payment. *Id.* at pp. 29–30. Mr. Meyer, therefore, has alleged the same injury as the class, and Indirect Purchaser Plaintiffs have provided evidence that adequately supports his claim for purposes of the standing analysis. As to Mr. Latona, while it is clear that he switched from Hytrin to generic terazosin, Indirect Purchaser Plaintiffs have not provided the Court with any record evidence to indicate that he actually paid less for the generic than he did for the branded Hytrin. Based on the evidence currently before the Court, Mr. Latona, therefore, does not have Article III standing.

### h. Wisconsin

Class representative Lavera Grosskrueger's husband, Ewald Grosskrueger, was prescribed Hytrin and generic terazosin hydrochloride during the period from 1998–2001. *See* Ex. G, at Tab 10. The Grosskruegers paid cash out-of-pocket for those prescriptions, which were filled via mail order by the American Association of Retired Persons Pharmacy and through two local pharmacies in Wisconsin. *Id.* Because she paid a lower price for the generic than for branded Hytrin, Mrs. Grosskrueger has standing to assert the claims of the Wisconsin class.

### 3. Standing Analysis Conclusion

Based on the foregoing analysis, the Court finds that for all of the proposed classes, except for the District of Columbia, at least one named plaintiff possesses the same interest and suffered the same alleged injury as the class members. *Prado–Steiman,* 221 F.3d at 1279–80. As to the District of Co-

enriched with excessive profits.

lumbia class, the Court concludes that class certification is inappropriate due to lack of standing. The Court will therefore proceed to the Rule 23 analysis only as it relates to the remaining seventeen proposed state classes.

### B. Standards for Determining Class Certification Under Fed.R.Civ.P. 23

Once a court has considered whether the named class representatives have standing to assert claims on behalf of the class, the analysis shifts to the requirements of Fed. R.Civ.P. 23. The burden of proof to establish the propriety of class certification rests with the advocate of the class—here, the Indirect Purchaser Plaintiffs. *See Jones v. Diamond,* 519 F.2d 1090, 1099 (5th Cir.1975) [19]; *see also Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir.1997). As the Eleventh Circuit instructs, the district court retains broad discretion in determining whether an action should be certified as a class action, and its decision, based upon the particular facts of the case, should not be overturned absent a showing of abuse of discretion. *See Andrews v. Am. Tel. & Tel. Co.,* 95 F.3d 1014, 1022 (11th Cir.1996) ("Assuming that the district court properly exercised its discretion within the parameters of the criteria of Rule 23, the court's determination should stand."). Nonetheless, the Court must conduct a "rigorous analysis" into whether the prerequisites of Rule 23 are met before certifying a class. *Jones v. Firestone Tire and Rubber Co., Inc.,* .977 F.2d 527, 534 (11th Cir.1992) (citing *General Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

"A class action may be maintained only when it satisfies all of the requirements of Fed.R.Civ.P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Rutstein v. Avis Rent–A–Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir.2000) (citing *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997)). Pursuant to Rule 23(a), a class may be certified only if: (1) the class is so numerous that joinder of all members would be impracticable; (2) there are

questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). These four prerequisites of Rule 23(a) are commonly referred to as "numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims." *Prado–Steiman v. Bush,* 221 F.3d 1266, 1278 (11th Cir.2000). Reviewing each of these requirements in turn, the Court finds that Indirect Purchaser Plaintiffs have met their burden under Rule 23(a).

#### 1. Numerosity

Fed.R.Civ.P. 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Defendants do not dispute that the proposed classes, as defined, satisfy the numerosity requirement. *See* Defs.' Opp'n, at p. 13, n. 6. Nonetheless, despite Defendants' concession on this element, the Court "has the responsibility of conducting its own inquiry as to whether the requirements of Rule 23 have been satisfied in a particular case." *See Valley Drug Co., et al. v. Geneva Pharm., Inc., et al.,* 350 F.3d 1181, 1188 (11th Cir.2003) (citing *Martinez–Mendoza v. Champion Int'l Corp.,* 340 F.3d 1200, 1216 n. 37 (11th Cir.2003)).

To meet the numerosity requirement, Indirect Purchaser Plaintiffs need not establish the exact size of the proposed class or identify all of the class members, but rather must demonstrate that the number is sufficiently large so as to make joinder impracticable. *See Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 878 (11th Cir.1986). Impracticability, however, does not mean impossibility. The numerosity requirement is met when it would be inconvenient or difficult to join all of the class members, and may be satisfied with as few as 25–30 class members. *In re NAS-DAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 508 (S.D.N.Y.1996); *see also*

---

**19.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991) (Paine, J.). While the size of the class is a highly relevant consideration, courts must take into account a number of other factors under Fed.R.Civ.P. 23(a)(1), including "the geographic diversity of the class members, the nature of the action, the size of each plaintiff's claim, judicial economy and the inconvenience of trying individual lawsuits, and the ability of the individual class members to institute individual lawsuits." *Walco Inv., Inc., v. Thenen,* 168 F.R.D. 315, 324 (S.D.Fla.1996) (Moreno, J.).

Considering these several factors, the Court finds that the Indirect Purchaser Plaintiffs have met their burden of establishing that the proposed classes are "so numerous that joinder of all members is impracticable." In the Fourth Amended Complaint, Plaintiffs allege that between October 1995 and August 1999, Hytrin was the highest-margin product of Abbott's Pharmaceutical Products Division, with total sales of Hytrin exceeding $1.75 billion. *See* Compl. at ¶ 10. Based on these sales figures, and using IMS data,[20] Indirect Purchaser Plaintiffs have posited that in each of the seventeen remaining classes, the most conservative estimate of the number of class members ranges from roughly 3,200 (North Dakota) to nearly 150,000 (California).[21] *See* Supplemental Measures of Class Damages, attached to IPPs' Pre–Argument Submission on Class Certification as Ex. K. Adding together all seventeen classes, the conservative estimated number of class members exceeds half a million end payers. *Id.*

It is undisputed that these thousands of members of the state Classes are geographically dispersed across their jurisdictions and throughout the United States. Further, many of the individual members of the state classes have claims that are far too small to justify bringing individual suits against the corporate Defendants. For these reasons, joinder of all members of the prospective classes would be highly impracticable. The Court therefore finds that the numerosity requirement of Rule 23(a)(1) has been satisfied.

### 2. Commonality

Under Fed.R.Civ.P. 23(a)(2), class certification requires a showing that "there are questions of law or fact common to the class." The threshold finding for commonality under this section is qualitative rather than quantitative. *See* 1 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:10 (4th ed.2002). Consequently, Rule 23(a)(2) "does not require that all the questions of law and fact raised by the dispute be common." *See Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1557 (11th Cir.1986). Instead, courts in the Eleventh Circuit have held that "a single common question is sufficient to satisfy Rule 23(a)(2)." *Powers v. Stuart–James Co.,* 707 F.Supp. 499, 502 (M.D.Fla.1989). As with the numerosity element, Defendants do not dispute that this requirement is met.[22] Nonetheless, the Court has conducted its own inquiry into the Rule 23(a)(2) requirement, and concludes that it has been satisfied.

Where the complaint alleges that the Defendants have engaged in a standardized course of conduct that affects all class members, the commonality requirement will generally be met. *See Roper v. Consurve, Inc.,*

---

**20.** IMS monitors prescriptions, compiling data by product and by distribution channel for a number of customers, including pharmaceutical companies. As Indirect Purchaser Plaintiffs noted at the March 12, 2004 oral argument, Abbott itself also relied on IMS data to predict the impact that generic entry would have on the market. Abbott has not disputed this.

**21.** As observed by several courts and commentators, once the good faith estimate of the class size reaches the thousands, the joinder impracticability test is satisfied and the analysis focuses on the "manageability and superiority of the proposed class action relative to other means for fair adjudication of the controversy." *See* 1 Alba Conte &

Herbert Newberg, *Newberg on Class Actions* § 3:5 (4th ed.2002). These issues will be addressed later in the Court's analysis of Fed. R.Civ.P. 23(b)(3).

**22.** While Defendants do not contest that there are common questions of law or fact sufficient to meet the Rule 23(a)(2) requirement, they do contend that the proposed classes cannot be certified because those common issues do not predominate over questions affecting only individual class members. This argument, however, is properly considered in the Rule 23(b)(3) analysis, and will be addressed at that time.

578 F.2d 1106, 1113 (5th Cir.1978). Specifically in the antitrust context, courts in this Circuit have consistently held that allegations of price-fixing, monopolization, and conspiracy by their very nature involve common questions of law or fact. *In re Carbon Dioxide Antitrust Litig.*, 149 F.R.D. 229, 232 (M.D.Fla.1993); *see also In re Infant Formula Antitrust Litig.*, No. MDL–878, 1992 WL 503465, at *3 (N.D.Fla. Jan.13, 1992); *see also State of Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 319 (5th Cir.1978).

Indirect Purchaser Plaintiffs cite several common questions of law and fact that affect all class members. *See* IPPs' Mem. at pp. 8–9. Among them are: (1) whether, under common principles of antitrust and unfair trade practice law, Defendants' methods, practices and acts, including, but not limited to, the Abbott–Zenith and Abbott–Geneva Agreements, violated the applicable laws of the respective Indirect Purchaser States; (2) whether Defendants' acts, contracts, combinations and conspiracy restrained competition for the sale of Hytrin and its generic bioequivalents and prevented or delayed introduction of any AB-rated generic version of Hytrin in the United States; (3) whether, and the amount by which, Defendants' illegal, inequitable and unfair trade practices have inflated the prices paid by members of the classes for Hytrin and its generic bioequivalents over the amounts they would have paid in a competitive market unaffected by Defendants' illegal acts; and (4) whether, under common principles of unjust enrichment, Defendants unjustly enriched themselves to the detriment of Plaintiffs and the classes, entitling Plaintiffs and the classes to disgorgement of all benefits derived therefrom. *Id.*

Because these, and many other, common questions of law and fact are applicable to the claims of all class members, the Court finds that the requirements of Rule 23(a)(2) have been satisfied.

### 3. Typicality

■ Under the third prerequisite for class certification, the Court must assess whether the claims or defenses of the named representatives are typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3).[23] "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir.1984); *see also In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 698 (N.D.Ga.1991). If the party advancing the class can establish that the same unlawful conduct was directed at or affected both the class representatives and the class itself, then "the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *In re Managed Care Litig.*, 209 F.R.D. 678, 682 (S.D.Fla.2002) (Moreno, J.) (citing *Davis v. Southern Bell Tel. & Tel. Co.*, No. 89–2839–CIV–NESBITT, 1993 WL 593999, at *4 (S.D.Fla. Dec.23, 1993)) (Nesbitt, J.); *see also Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir.1985) (noting that "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences"). "[A]ny atypicality or conflict between the named Plaintiffs' claims and those of the Class 'must be clear and must be such that the interests of the class are placed in significant jeopardy.'" *Id.* (citing *Walco*, 168 F.R.D. at 326).

■ Indirect Purchaser Plaintiffs assert that they have met the typicality requirement by virtue of the fact that all of the members of the proposed classes—consumers and third party payers alike—have been subjected to overcharges for their payments for Hytrin because of the Defendants' same unlawful conduct. *See* IPPs' Mem. at p. 10. Specifically, Indirect Purchaser Plaintiffs argue that because "[a]ll of the claims of both the representative Plaintiffs and the Classes

---

**23.** The Eleventh Circuit has recognized that "[i]n many ways, the commonality and typicality requirements of Rule 23(a) overlap. Both requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification. Tradi-

tionally, commonality refers to the group characteristics of the class as a whole and typicality refers to the individual characteristics of the named plaintiff in relation to the class." *Prado–Steiman*, 221 F.3d at 1278–79 (internal citations omitted).

arise out of the same conduct of Defendants and are based on the same related antitrust theories of monopolization and conspiracy in restraint of trade," the claims of the class representatives are typical of those of the class members. *Id.* Further, Indirect Purchaser Plaintiffs emphasize that despite some variation in the manner in which the overcharge was paid (for instance, in some cases either the consumer or the third party payer paid the entire amount of the prescription, while at other times, the consumer paid a portion and the third-party payer paid the remainder), the consumers and third party payers who comprise the proposed state classes all overpaid for Hytrin or generic terazosin as a direct result of Defendants' alleged misconduct. *Id.*

Defendants challenge Indirect Purchaser Plaintiffs' ability to satisfy the typicality requirement, arguing that each class member's ability to prove its claim will depend on the unique facts surrounding that class member's payment for its prescription for Hytrin and/or its generic alternatives. Further, Defendants dispute that the claims of third-party payers are properly considered "typical" of the claims of consumers, and that the claims of consumers are "typical" of the claims of third-party payers. These arguments, however, misconstrue Indirect Purchaser Plaintiffs' burden under Rule 23(a)(3).[24]

As noted above, once the party advancing the class establishes that the same unlawful conduct was directed at or affected both the class representatives and the class itself, then "the typicality requirement is usually met irrespective of varying fact patterns which underlie the individual claims." *In re Managed Care Litig.*, 209 F.R.D. at 682; *see also Singer v. AT & T Corp.*, 185 F.R.D. 681, 689 (S.D.Fla.1998) (noting that typicality "does not demand factual homogeneity. Therefore, the existence of factual differences does not defeat typicality."). In this

case, Indirect Purchaser Plaintiffs allege that the same unlawful conduct affected both the class representatives and the class itself. Specifically, consumers and third-party payers "engaged in the exact same type of transactions (retail payments for ·terazosin), most often as partners in common transactions (as co-payers) and suffered the same damage as a result of generic delay—they paid more than they otherwise would have paid for terazosin." *See* IPPs' Pre–Argument Submission on Class Certification, at p. 11.

> As explained in *Newberg on Class Actions,* The main principle behind typicality is that the plaintiff will advance the interests of the class members by advancing her or his own self-interest. The alignment of inter-·est is not the test for typicality. It is the result. The plaintiffs and class members have similar interests because they have similar claims. The plaintiff whose claim is typical will ordinarily establish the defendants' liability to the entire class by proving his or her individual claim.

*See* 6 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 18:8 (4th ed.2002). Here, the claims of the consumer and the third-party payer class representatives are not only typical of the claims of all class members, they are virtually identical in nature, notwithstanding variations in the amount of damages. Consequently, if one class representative is able to prove that Defendants' alleged anticompetitive acts caused an overcharge for terazosin hydrochloride, or that Defendants were unjustly enriched at Indirect Purchaser Plaintiffs' expense, such proof will likewise prove the case on liability for every other class member. While Defendants attempt to distinguish the claims of the individual consumers from those of the third-party payers, it must be noted that "[t]ypicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *In re Playmobil Antitrust Litig.*, 35 F.Supp.2d

---

**24.** While Defendants state that they challenge Indirect Purchaser Plaintiffs' ability to meet the Rule 23(a)(3) standard, they have focused their arguments on the 23(a)(4) and 23(b)(3) elements, never clearly articulating the nature of their opposition with respect to the typicality prong. The elements of Rule 23 are overlapping and

often difficult to extricate from one another. Therefore, while Defendants have asserted additional arguments that may, arguably, apply to the typicality analysis, those arguments are more appropriately considered in the Court's analysis of Rule 23(a)(4) and 23(b)(3).

231, 242 (E.D.N.Y.1998). Indeed, "there is nothing in Rule 23(a)(3) which requires named plaintiffs to be clones of each other or clones of other class members." *Id.* (quoting *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1036 (N.D.Miss.1993) (rejecting the argument that diversity among named plaintiffs destroys typicality)). Accordingly, the Court finds that the interests of the class representatives and the absent class members are sufficiently aligned for purposes of Rule 23(a)(3).

### 4. Adequacy of Representation

Rule 23(a)(4) requires that the representative party in a class action "must adequately protect the interests of those he purports to represent." *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (citing *Phillips v. Klassen*, 502 F.2d 362, 365 (D.C.Cir.1974)). As interpreted by the Supreme Court and by the Eleventh Circuit, this requirement applies to both the named plaintiffs and to the class counsel. *See London v. Wal–Mart Stores, Inc.*, 340 F.3d 1246, 1253 (11th Cir.2003) (citing *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). "Because all members of the class are bound by the res judicata effect of the judgment, a principal factor in determining the appropriateness of class certification is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia–Pacific Corp. Salaried Employees Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir.2000) (internal citations omitted). This analysis "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Valley Drug Co.*, 350 F.3d at 1189 (citing *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 460–61 (N.D.Ala. 2003)).

### a. Conflicts of Interest

The Eleventh Circuit Court of Appeals has held that "[i]f substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Id.* However, "the existence of minor conflicts alone will not defeat a party's claim to class certification; the conflict must be a 'fundamental' one going to the specific issues in controversy." *Id.* (citations omitted). A fundamental conflict exists "where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* "In such a situation, the named representatives cannot 'vigorously prosecute the interests of the class through qualified counsel' because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members." *Id.* (citing *In re HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447, 461–63 (N.D.Ala.2003)); *see also Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir.2000) (holding that "a class action cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class."). Notably, a class conflict can be established in two ways: (1) where the record shows hard evidence of an actual disagreement or conflict; or (2) where the class is such that the court can simply imply that a realistic possibility of antagonism exists.[25] *See Miles v. Metro. Dade County*, 916 F.2d 1528, 1534 (11th Cir.1990) (citing *Horton v. Goose Creek Ind. School Dist.*, 690 F.2d 470, 485–86 (5th Cir.1982)).

Defendants assert several potential "conflicts" and alleged antagonistic interests that they claim defeat Indirect Purchaser Plaintiffs' class certification motions. Specifically, Defendants focus on: (1) perceived conflicts of interest between third-party payers and insured consumer class members; (2) conflicts among third-party payer insurers and pharmacy benefits management companies ("PBMs"); (3) consumers who paid the same flat co-payment for branded drugs as for the

---

**25.** In assessing whether a realistic possibility of antagonism exists, the Eleventh Circuit has looked at the economic realities of the case to determine whether "the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of unnamed class representatives." *See Valley Drug Co.*, 350 F.3d at 1189–90.

generic equivalent; and (4) "brand loyal" consumers. *See Defs.' Submission Regarding Application of Eleventh Circuit's Direct Purchaser Class Certification Ruling to Indirect Purchaser Plaintiffs' Consolidated Motion for Class Certification,* [DE–1052] at pp. 2–8; *see also Defs.' Citations of Record Evidence,* [DE–1080] at pp. 2–10. The Court has carefully considered each of these purported "conflicts," and concludes that they do not preclude certification of the proposed classes.

### i. Conflicts Between Third–Party Payers and Consumers

As addressed in Section III.B.3, *supra,* Defendants object to the inclusion of both consumers and third-party payers in the same class.[26] Here, Defendants argue that third-party payers have not been injured by any alleged antitrust violations, and therefore are not proper class members or class representatives, because they would have recovered any overcharges to which they may have been subjected through premiums collected from insured consumers. *See Def.'s Opp'n,* at pp. 14–15; *see also* DE–1052 at pp. 7–8. The crux of Defendants' argument on this issue is summarized in the following passage:

> . . . [I]nsurers generally determine an insured group's prescription drug benefit premiums for a plan year by adding up the group's covered claims experience for the preceding year, using actuarial techniques to project the prior experience forward and estimate expected claims for the coming year, and then calculating the premium needed to recover the expected claims (plus any administrative expenses and profit). Because they reflect a group's complete claims experience, including reimbursements for all covered branded and generic drugs, premiums automatically reflect not only the costs of all covered drugs but also all changes in such costs, including from the introduction of generics. Under this system, therefore, the premiums paid by all insured consumers and their employers (because they pay a portion of the premiums) will vary depending on the availability of generic versions of drugs without the insurer needing to track or predict specific generic launches because the claims experiences will incorporate the prices of all drugs and will fall with generic entry as a new generic makes price and market share inroads on a branded drug.

*See Defs.' Opp'n,* at p. 14. Indirect Purchaser Plaintiffs argue that Defendants' asserted "conflict" is based on a misreading of the record evidence and misapprehends the nature of the premium setting process.[27]

In support of this contention, Defendants rely primarily on the testimony of Janet McGowin, a Vice President with Alabama Blue, and Michael Murray, Cobalt's Vice President and Chief Actuary. Ms. McGowin and Mr. Murray both testified (either through depositions or affidavits) as to the model used by insurance companies for setting future premiums. Specifically, Defendants rely on Ms. McGowin's testimony that

---

**26.** While this issue was already addressed in the typicality section, it is also relevant to the analysis of the "adequacy of representation" prong, as Defendants contend that fundamental conflicts between the two types of end-payers preclude the certification of mixed consumer-TPP classes.

**27.** Indirect Purchaser Plaintiffs also contend that the pass-on issue is "at best, an affirmative defense and may not be considered at the class certification stage." *See IPPs' Reply,* at pp. 11–12. Because Defendants' pass-on argument requires resolution of the factual issue of whether overcharges are actually passed on to premium payers, as well as the legal issue of whether the pass-on defense is viable under a given state's antitrust law, Indirect Purchaser Plaintiffs contend that consideration of this issue is premature at the class certification stage. *Id.* (citing *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. at 696). Indirect Purchaser Plaintiffs also contend that *Hanover Shoe v. United Shoe Machinery Corp.,* 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), prohibits defensive use of the pass-on argument. However, in *Valley Drug Co.,* the Eleventh Circuit disapproved of Indirect Purchaser Plaintiff's attempt to use *Hanover Shoe* as "a talisman warding away the requirements of Rule 23 and barring this court from exercising its duty to conduct an inquiry into whether the plaintiffs' proposed class satisfied the four requirements of Rule 23(a)." *Valley Drug Co.,* 350 F.3d at 1192. Therefore, because the pass-on issue is relevant to the determination of whether any conflicts exist that would preclude class certification, the Court has conducted its own analysis of the record evidence upon which Defendants rely.

Alabama Blue looks at the premiums received from a particular group in the previous year, considers the amount of claims incurred from the group, and projects the claims forward to see how much of a percentage increase would be required to cover those claims. Defendants also point to Ms. McGowin's testimony that the claims experience used to project new premiums consists of "[a]ny claims paid to any provider or subscriber during the time period" leading up to the renewal calculation, including all drug costs. Similarly, Defendants note Mr. Murray's testimony that Cobalt "analyzes a group's prior pharmacy benefit experience in the aggregate, then factors in information about future trends in drug costs to set a premium for pharmacy benefit coverage."

While these quotes are accurate, the record indicates, and Defendants concede, that the third-party payers take no account of the expected impact of individual drugs (such as Hytrin) on claims when determining premiums to be charged. In fact, Mr. Murray testified that "Cobalt does not consider potential price increases for specific drugs when predicting future trends in drug costs... Instead, Cobalt analyzes drug costs in the aggregate to determine appropriate trend factors for these pharmacy benefits services." Therefore, Defendants' claim that any overcharges for Hytrin in particular were passed on by the third-party payers to consumers the following year is unsupported by the record.

Further, to the extent that any third-party payer did charge its insureds a higher premium because of a drug company's monopolistic activities, the charging of a higher premium in the future cannot be accurately described as a "pass on" of those charges. The record is clear that the purpose of a future projection is, as the name implies, to estimate anticipated future costs. Defendants point to nothing in the record that indicates that the purpose of projecting a future cost (and charging such a cost as a premium in the

future) is to recover money that a third-party payer is paying out for present claims. Nor have Defendants shown such a recovery to be the result of future claims projections. Indeed, as Ms. McGowin testified, if, in a given year, an insurance company pays out more in claims that it has charged as a premium, the company records that deficit as a loss and there is no retroactive increase of the premium charged for that year.

Defendants repeatedly argue, throughout their submissions, that the burden of establishing that class certification is appropriate rests with the advocate of the class, here the Indirect Purchaser Plaintiffs. While this is a correct statement of the law in this Circuit, see *Gilchrist v. Bolger*, 733 F.2d 1551, 1556 (11th Cir.1984), class certification cannot be defeated merely because Defendants assert unsupported allegations of conflict between potential class members. When Defendants come forward with an alleged conflict, the Court must scrutinize the record citations Defendants cite to determine whether such evidence establishes the existence of a conflict, or whether it provides a basis for the Court to imply that a realistic possibility of antagonism exists. See *Valley Drug Co.*, 350 F.3d at 1192; see also *Miles*, 916 F.2d at 1534. If "the evidence provided by the defendants is deemed to be inaccurate or unreliable ... the plaintiffs may yet meet their burden of proof necessary to maintain a class action under Rule 23(a)(4)." *Id.* In this case, extensive discovery on the issue of the alleged "pass on" has been conducted, and Defendants' citations fail to establish any *fundamental* conflict, or provide any indication that a "realistic probability of antagonism" exists, such that class certification would be inappropriate. Accordingly, the Court rejects this argument.[28]

### ii. *Conflicts Between Third–Party Payers and PBMs*

Next, Defendants contend that conflicts between third-party payers and PBMs

---

28. Defendants also make a more general argument that conflict necessarily exists between third-party payers and consumers because third party payers will presumably seek to maximize their damages to the detriment of consumer class members. *See* Defs.' Opp'n, at pp. 44–45. The same argument was rejected by the Court in *In re Cardizem*, 200 F.R.D. at 337. "Such hypothetical conflicts regarding proof of damages are not sufficient to defeat class certification at this stage of the litigation." *Id.* (citing *In re NASDAQ*, 169 F.R.D. at 512).

preclude certification.[29] PBMs are pharmacy benefit managers, such as Medco, AdvancePCS and Express Scripts, that serve as "conduits" for third-party payers in administering pharmacy benefits. Specifically, PBMs' principal business is to administer pharmacy benefits that their customers, insurers and self-funded plans, offer to insured individuals. *See* Defs.' Opp'n, at p. 31 and included citations. These companies process patient claims and requests for coverage or reimbursement and pay pharmacies and covered members for the costs of prescriptions filled. *Id.* According to specific contractual terms negotiated with each insurer customer, the insurers then reimburse the PBMs for some or all of the costs of the claims they process and pay. *Id.*

Defendants contend that the multi-faceted and complex roles that PBMs play in the pharmaceutical distribution and benefits administration process create irreconcilable intra-class conflicts between PBMs and their insurer clients, and render class-wide determination of impact and damages impossible.[30] First, Defendants argue that if a PBM bears the risk of any overcharge for Hytrin purchases,[31] then the insurer would be shielded from the risk and the PBM, not the insurer, would be a class member. In such a situation, Defendants contend, no common formula for calculating damages could properly account for the PBMs absent highly complex,

individualized inquiries regarding the reimbursement terms of specific contracts. Second, Defendants argue that PBMs earning fees under an administrative-services only ("ASO") contract may have benefitted by the delay in generic entry because they were compensated with a percentage of the value of claims; therefore, they would have earned more by opting for the more expensive brand-name Hytrin over the less expensive generic substitutes. Similarly, Defendants contend that PBMs receiving Hytrin rebates from Abbott may have fared better prior to generic entry.

Again, Defendants have failed to identify any specific record evidence supporting their allegations of conflict, or to provide the Court with a sufficient basis for implying that a realistic probability of antagonism exists. First, Indirect Purchaser Plaintiffs concede that to the extent that a PBM is at risk for paying the overcharge at issue, then the PBM falls within the definition of the classes, a possibility taken into account in their damages model. *See* IPPs' Reply Mem., at p. 20. And while Defendants argue that the inclusion of PBMs will create the need for individualized inquiries, any such individual issues can be adequately addressed during the claims administration stage of this litigation. *See* Section III.C.1 below.

Second, Defendants' allegations of fundamental intra-class conflicts are premised

**29.** Defendants also present this argument as a challenge to the predominance requirement of Rule 23(b)(3). There, Defendants contend that the role of PBMs creates individualized issues that preclude class treatment. In the interest of clarity and brevity, the Court will only analyze this asserted challenge in this section.

**30.** As with other areas of their argument, Defendants' issues regarding PBMs apply to several portions of the Rule 23 analysis. In particular, Defendants argue that: the inclusion of PBMs in the classes will require several individualized inquiries to prove impact (which relates primarily to the predominance requirement of Rule 23(b)(3)); calculating class-wide damages will be impossible in light of the PBMs (also relevant to the Rule 23(b)(3) analysis); and intra-class conflicts potentially exist between PBMs and their insurer clients (relevant to the instant Rule 23(a)(4) adequacy of representation analysis). Because these issues are, to a certain extent, inextricably intertwined, they will all be addressed in this section.

**31.** Defendants provide two potential sources of the "risk" allegedly borne by the PBMs. First, they argue that PBMs have manipulated "spreads" between the amounts that PBMs pay to pharmacies for prescriptions and the amounts that PBMs are reimbursed by their insurer clients in order to reap unfair profits at the insurers' expense. *See* DE–1052 at 4, *see also* Defs.' Opp'n, at pp. 31–32. To the extent that there was an overcharge on Hytrin, Defendants argue, PBMs would have borne a portion of the overcharge as a result of the spread between their pharmacy and insurer reimbursement formulas. *Id.* Second, Defendants contend that PBMs with "capitated" fee arrangements— where the insurer pays the PBM a negotiated fee per member per month in exchange for the PBM bearing the responsibility for reimbursing all covered claims—bear the risk of any overcharges and also shield the insurer from any such overcharges. *Id.*

largely on unsupported speculation and hypothetical situations. As explained above, *see supra* note 26, Defendants' conflicts argument focuses on the alleged "spread" between the amounts that PBMs pay to pharmacies and the amounts they are reimbursed, the existence of purported "capitated" fee arrangements, and the alleged rebates that Abbott pays to PBMs for Hytrin. As to the first issue, Defendants proffer no evidence that the existence of "spreads" is prevalent or that they existed with respect to Hytrin or generic terazosin at all.[32] In fact, several PBM representatives testified that to their knowledge, no such "spreads" were in place. *See* IPPs' Reply at pp. 20–21 and citations thereto. Next, while there has been no evidence in this case to support a finding that PBMs have capitated fee arrangements for pharmacy benefits, if such arrangements existed, the number would be *de minimis* and would not impact on the damages calculations. *Id.* And finally, Defendants, despite having taken extensive discovery on the issue of PBMs, have failed to provide any record evidence buttressing their position that the existence of rebates benefitted PBMs and created a "fundamental" intraclass conflict. Indeed, nothing in the record even indicates that a reasonable probability of antagonism exists, particularly one that would result in a "fundamental" intraclass conflict. The presence of PBMs, therefore, will not suffice to defeat class certification.

### iii. *Flat Co-Payers*

■ Relying on the Eleventh Circuit's decision in *Valley Drug Co.*, Defendants argue that certification of the proposed classes is inappropriate because they include class members who were unharmed or who, in fact, benefitted from delayed generic entry. As to the former, Defendants point to those insured consumers who paid the same flat co-payment for drug purchases irrespective of whether they opted for the brand name drug or the generic bioequivalent. With respect to these individuals, Defendants argue, there can be no showing that generic foreclosure resulted in any antitrust injury. Further, as Defendants note, Indirect Purchaser Plaintiffs' damages expert, Dr. Hartman, conceded that consumers with flat co-payments would not have been harmed by delayed generic entry.

In this regard, the Court agrees that flat co-payers, who suffered no economic injury due to delayed generic entry, are not proper class members. However, Indirect Purchaser Plaintiffs' proposed class definition properly accounts for the flat co-payer problem, as it specifically excludes "indirect purchasers who suffered no economic injury as a result of Defendants' allegedly unlawful conduct." Thus, the Court finds that flat co-payers are not part of the proposed classes, as defined, and therefore present no obstacle to class certification.[33]

### iv. *Brand Loyalists*

■ Finally, Defendants oppose Indirect Purchaser Plaintiffs' ability to establish the adequacy of class representation requirement because of the presence of brand loyalists in the proposed class definition. Brand loyalists, as defined by Defendants, are those consumers who would not have switched from Hytrin to generic terazosin even if the

---

**32.** On the "spread" issue, Defendants primarily rely on two recently filed state court complaints in California and Ohio. *See* DE–1052 at pp. 4–6. In those two cases, the plaintiffs merely alleged what Defendants argue here, that such spreads existed, resulting in PBMs like Medco reaping improper benefits from their processing of Hytrin prescriptions. *Id.* However, Defendants' assertion that "the very existence of the two lawsuits demonstrates an actual conflict among putative class members on these issues," *see id.* at p. 6, is incorrect. As noted above, a party seeking to demonstrate a fundamental class conflict must either cite to record evidence establishing an actual disagreement or

conflict, or provide a sufficient basis for the court to imply that a realistic possibility of antagonism exists. *See Miles*, 916 F.2d at 1534. The existence of untested allegations in two state court complaints satisfies neither standard.

**33.** Defendants argument that Dr. Hartman's proposed methodologies for calculating class-wide damages fails to account for the exclusion of flat co-paying insurers will be addressed in connection with the Court's Rule 23(b)(3) analysis. *See* Section III.C.1 below.

generic had been available, *i.e.* in the "but-for" world. Defendants contend that these individuals would have benefitted from delayed generic entry because Hytrin prices, on average, increased after generic entry. *See* Defs.' Opp'n, at p. 36. For that reason, Defendants argue that their presence in the class defeats certification under the Rule 23(a)(4) analysis. In turn, Indirect Purchaser Plaintiffs seek to include brand loyalists in the classes, to the extent that those who paid less for branded Hytrin post-generic entry were injured by the delayed generic entry to market.

The record is devoid of any evidence that brand loyalists "benefitted" from delayed generic entry, nor does it appear from the record that a reasonable probability of antagonism exists with respect to such individuals. In fact, when asked to provide evidence supporting their argument that brand loyalists benefitted from generic foreclosure, Defendants instead argued that Dr. Hartman's damages methodology fails to adequately account for, or quantify, such consumers.[34] However, the Court also notes that Indirect Purchaser Plaintiffs have failed to identify any record evidence establishing that such injured brand loyalists exist, and supporting their theory that such consumers have suffered an injury. Therefore, at this stage of the litigation, the Court will exclude brand loyalists from the definition of the Indirect Purchaser state classes.

**34.** As with the flat co-payers, Defendants lead into their Rule 23(b)(3) challenge on the predominance issue by arguing that Dr. Hartman's methodology fails to account for brand loyalists. Specifically, Defendants contend that Dr. Hartman has not quantified how many brand loyal consumers are in the proposed classes, and that he has not proposed any method to determine this information without individualized inquiries. Again, these issues, which overlap somewhat with the instant Rule 23(a)(4) conflicts analysis, are more appropriately addressed as part of the Court's Rule 23(b)(3) analysis. *See* Section III.C.

**35.** To a certain extent, the Rule 23(a)(4) analysis collapses into the Rule 23(a)(3) consideration of typicality, "because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."

**36.** The Court also notes that to the extent that they will act as representatives of the consumer class members (and state agencies who pur-

### b. Vigorous Prosecution of Class Claims

Rule 23(a)(4) is also designed to ensure that the class representatives and class counsel will vigorously prosecute the class claims. *See Andrews v. Am. Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir.1996) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir.1996)).[35] As discussed in previous sections, the Court has concluded that the claims of the class representatives are typical, that they have an interest in vigorously prosecuting the class claims, that no conflicts exist between the class representatives and the unnamed class members, and that the interests of the class representatives are sufficiently aligned with those of the class members for purposes of Rule 23(a) analysis.[36] Further, as will be addressed in Section III.D below, Co–Lead Counsel for the Indirect Purchaser Classes are knowledgeable in the antitrust field, experienced in complex litigation and in jury trials, and possess the necessary incentives and qualifications to vigorously prosecute this action on behalf of the Classes. Therefore, the Court concludes that the vigorous prosecution test of Rule 23(a)(4) has been satisfied.

### C. The Requirements of Rule 23(b)(3)

In addition to satisfying these four requirements of Rule 23(a), Indirect Purchaser

chased Hytrin) in their states, the Attorneys General from the states of Florida and Kansas are adequate representatives who will vigorously prosecute the claims of those states' consumers. At the March 12, 2004 oral argument, the Court inquired of the Indirect Purchaser Plaintiffs as to the precise nature of the Attorneys General's involvement in this litigation. As explained by Barbara Smithers, Assistant Florida Attorney General, and Patricia Connors, the Chair of the Multistate Task Force of the Antitrust Division of the Florida Attorney General's office, class counsel to the Indirect Purchaser Plaintiffs has ceded the lead in representation of the consumer claims in Florida and Kansas to the Attorneys General's offices. In fact, the Attorneys General have a "co-counsel" relationship with Co–Lead Counsel. Their primary involvement, however, will be in the civil penalties damages phase of the case and in representing the interests of the individual consumers in any mediation activities.

Plaintiffs must meet one of the alternative requirements set forth in Rule 23(b). With respect to this element, Indirect Purchaser Plaintiffs seek class certification under Rule 23(b)(3), which imposes two additional requirements—(1) that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members"; and (2) that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). In conducting this analysis, "the Court must scrutinize the evidence plaintiffs propose to use in proving their claims without unnecessarily reaching the merits of the underlying claims." *See In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 684 (N.D.Ga.1991).

### 1. Predominance of Common Questions of Law or Fact

That common questions of law or fact predominate over individualized questions means that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, must predominate over those issues that are subject only to individualized proof." *Kerr v. City of West Palm Beach,* 875 F.2d 1546, 1558 (11th Cir.1989) (quoting *Nichols v. Mobile Bd. of Realtors, Inc.,* 675 F.2d 671, 676 (5th Cir.1982)). "The predominance inquiry focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson,* 130 F.3d at 1005 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). Nonetheless, "[c]ommon questions need only predominate; they need not be dispositive of

the litigation." *In re Potash Antitrust Litig.,* 159 F.R.D. at 693.

As part of the predominance analysis, courts must "examine the causes of action asserted in the complaint on behalf of the putative class." *Rutstein,* 211 F.3d at 1234 (citing *McCarthy v. Kleindienst,* 741 F.2d 1406, 1412 (D.C.Cir.1984)). Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action. *Id.* (citing *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231) ("[The predominance] inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy.").[37] Therefore, "when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position," the predominance test will be met. *See In re Potash Antitrust Litig.,* 159 F.R.D. at 693 (internal citations omitted); *see also In re NASDAQ,* 169 F.R.D. at 517 (noting that the predominance requirement is satisfied "unless it is clear that individual issues will overwhelm the common questions and render the class action valueless.").

In determining whether Rule 23(b)(3) is satisfied, the Court must consider how Indirect Purchaser Plaintiffs intend to prove: (1) liability on each of their claims; (2) the fact of injury; (3) the quantum of injury, namely the amount of their damages; and (4) whether the evidence is common to the class or unique to the individual class members. *See In re Cardizem,* 200 F.R.D. at 340. In so doing, the Court must not consider the merits of the Indirect Purchaser Plaintiffs' claims, but rather must consider whether each element is susceptible to proof by gen-

**37.** *See generally Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978) ("[C]lass determination generally involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'") (quoting *Mercantile Nat. Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523,(1963)); *id.* at 469 n. 12, 98 S.Ct. 2454 ("'The more complex determinations required in Rule 23(b)(3) class actions entail even greater entanglement with the merits.'") (quoting 15 C. Wright, A. Miller, & E. Cooper, *Federal*

*Practice and Procedure* § 3911, p. 485 n. 45 (1976)); *Castano v. American Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996) ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues."); *Huff v. N.D. Cass Co.,* 485 F.2d 710, 714 (5th Cir.1973) (en banc) ("It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether plaintiff can succeed on the merits.").

eralized evidence. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) ("A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail ..."); *see also In re Polypropylene Carpet Antitrust Litig.,* 178 F.R.D. 603, 611 (N.D.Ga.1997) (noting that the Court must examine "whether sufficient evidence exists to reasonably conclude that Plaintiffs may proceed in the manner proposed, not whether the evidence can withstand any and all factual challenges leveled by Defendants").

Upon examination of the antitrust and unjust enrichment claims of the proposed classes, and based on an analysis as to whether the resolution of class-wide issues will have a substantial impact on each class member's underlying case, the Court concludes that common questions of law *and* fact predominate over individuals issues. Therefore, the requirements of Rule 23(b)(3)'s predominance test have been met.

### a. Common Proof on Antitrust Liability

In this case, the claims of the proposed state classes arise out of the same alleged illegal conduct by Defendants and are based on the same related antitrust theories of monopolization and conspiracy in restraint of trade. Although each proposed class is proceeding under its own state law, class certification pursuant to Rule 23(b)(3) is nonetheless appropriate where there is a commonality of substantive law applicable to all class members. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 821–23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Indirect Purchaser Plaintiffs have cited case law under each state antitrust statute interpreting the acts coextensively with the federal antitrust laws. *See* IPPs' Mot. at pp. 21–40. As explained below, the essential elements of Indirect Purchaser Plaintiffs' antitrust claims do not vary significantly from state-to-state,[38] and they are susceptible to proof using common evidence.

#### i. *Conspiracy to Restrain Trade*

In general, a federal or state claim based upon a theory of antitrust conspiracy raises three ultimate issues to be proven at trial: (1) the existence of a contract, combination or conspiracy in restraint of trade (liability); (2) injury-in-fact (antitrust injury); and (3) the extent of injury (damages). *See J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). As demonstrated by Indirect Purchaser Plaintiffs, all proof relative to Defendants' alleged conspiracy to restrain trade is common to the members of each of the state classes. In fact, "courts repeatedly have held that the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present." *In re NASDAQ,* 169 F.R.D. at 518; *see also In re Potash Antitrust Litig.,* 159 F.R.D. 682. This holding is equally applicable to market allocation cases. *See In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d 682, 706 (E.D.Mich.2000).

Indirect Purchaser Plaintiffs intend to rely on common evidence, in the form of Defendants' covert written agreements to delay domestic competition for the sale of terazosin hydrochloride, to establish the existence of a conspiracy to restrain trade. On this element, there can be no serious dispute that the proposed generalized evidence will apply to each class as a whole, as "such proof obviates the need to examine each class member's individual position." *In re Potash Antitrust Litig.,* 159 F.R.D. at 693.

#### ii. *Monopolization*

Whether proceeding under federal or state antitrust law, claims of monopolization are generally proven by demonstrating: (1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance or use of that power by anticompetitive or exclusionary means. *United States v. Grinnell,* 384 U.S. 563, 570–71, 86

---

**38.** Based on the controlling precedents in each state, the primary difference between the state antitrust laws and the federal statutes is that indirect purchasers, to the extent they can prove that they were injured by Defendants' conduct, have standing to prosecute the state law claims. *See California v. ARC Am. Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989).

S.Ct. 1698, 16 L.Ed.2d 778 (1966). In the instant case, all proof relevant to the monopolization claims is common to each of the state classes.

The first element of a monopolization claim—monopoly power—is "the power to control market prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "[T]he material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so." *American Tobacco Co. v. United States*, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). In determining whether a defendant has market power, a court must assess whether the "seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market." *Fortner Enter., Inc. v. United States Steel Corp.*, 394 U.S. 495, 504, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969). All of these issues are capable of determination using common proof, as they focus on Abbott's power and are not impacted by any individual determinations relating to specific classes or class members.

Additionally, the definition of the relevant market for determining market power is a question common to all members of the class, and is one that will predominate over any individualized inquiries. *See Jennings Oil Co., Inc. v. Mobil Oil Corp.*, 80 F.R.D. 124, 129 (S.D.N.Y.1978); *see also Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 794 n. 6 (10th Cir.1970). Indirect Purchaser Plaintiffs from all states have uniformly alleged, and will attempt to prove through common evidence, that Abbott had market power in the United States market for terazosin hydrochloride. Each absent member of the proposed classes will assert the same definition. Therefore, whether Abbott had market power is a question common to all members of each of the state classes, and the resolution of this common issue will affect all members of the classes without regard to individualized inquiries.

Finally, as to the second element of a monopolization claim, Indirect Purchaser Plaintiffs can establish the willful acquisition or maintenance of monopoly power by demonstrating that the alleged monopolist "impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). In this case, once the members of the state classes establish that Abbott is a monopolist, Indirect Purchaser Plaintiffs will uniformly focus on the Abbott–Geneva and Abbott–Zenith agreements to satisfy this second element of the monopolization claim. *See* IPPs' Mot. at p. 18. Accordingly, the predominance test has been met as it relates to Indirect Purchaser Plaintiffs' monopoly claims.

### iii. *Common Proof of Antitrust Impact*

The fact of injury or "impact" is an essential element of the antitrust claims that requires proof that Indirect Purchaser Plaintiffs suffered some injury that was caused by Defendants' antitrust violations. *See Martino v. McDonald's Sys. Inc.*, 86 F.R.D. 145, 147 (N.D.Ill.1980) (observing that "the fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief."). Indirect Purchaser Plaintiffs have shown that they can use common evidence to prove the impact of the Defendants' alleged anti-competitive conduct with a fair degree of certainty as to the proposed classes, without resorting to lengthy individualized examinations.

In an overcharge case, impact is shown through proof that: (1) Defendants charged more than they would have but-for their antitrust violation; and (2) class members made some purchases at the illegally inflated or stabilized price. *See Hanover Shoe v. United Shoe Mach. Corp.*, 392 U.S. 481, 489, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968); *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 324 (5th Cir.1978). Courts in the Eleventh Circuit have recognized that a presumption of impact properly arises in such cases where the defendants have market power

and are alleged to have conspired with competing manufacturers. *See In re Agric. Chem. Antitrust Litig.*, No. 94–40216–MMP, 1995 WL 787538, at *12 (N.D.Fla. Oct.23, 1995). Thus, here, a presumption of impact may apply.

However, even putting aside this presumption of impact, Indirect Purchaser Plaintiffs have presented ample common evidence, premised on market data and expert testimony, on this element. Specifically, Indirect Purchaser Plaintiffs propose to establish antitrust impact by showing, *inter alia*, that:[39] (1) Hytrin and its AB-rated generic bioequivalents are interchangeable versions of the same prescription drug product, with the exception that the generic costs significantly less than the branded Hytrin; (2) generic entry into the market results in significant savings for end-payers and a greater market share for the generic drug because many consumers would switch to the lower-priced alternative; (3) after Geneva launched its generic terazosin capsule on August 13, 1999, the shares of sales accounted for by the generic terazosin markedly increased, while the price of terazosin decreased; (4) class members made payments for Hytrin at inflated rates during the period of generic foreclosure, from 1995 through August 12, 1999, which can be confirmed through generalized market data; (5) class members could have obtained terazosin hydrochloride at much lower prices absent the existence of the Abbot–Geneva and Abbot–Zenith accords, and in the absence of Abbott's sham prosecution of the add-on patents; and (6) Defendants used the same data and a substantially similar methodology as that used by Indirect Purchaser Plaintiffs here to forecast the economic effects of generic competition for Hytrin. Other courts have found such generalized evidence of impact to be sufficient for class certification purposes. *See In re Cardizem*, 200 F.R.D. at 341.

Defendants primarily challenge the impact element by arguing that: (1) third-party payers passed on all claimed overcharges to consumers, and therefore, cannot prove that they sustained any antitrust impact; (2) the multi-faceted role of PBMs creates individualized inquiries that are not susceptible to common proof on impact; and (3) some consumers included in the class definition were not harmed. The Court has previously addressed, and rejected, each of these contentions. And to the extent that Defendants argue that these issues will necessarily result in individualized inquiries, such individualized examinations "will relate to the quantum of damages, not the fact of injury." *See In re Cardizem*, 200 F.R.D. at 307. Therefore, because the fact of antitrust injury is susceptible to common proof, as outlined above, Defendants' challenges are insufficient to defeat class certification.

### b. Common Proof of Unjust Enrichment

Likewise, the question of whether Defendants were unjustly enriched is susceptible to proof using common, generalized evidence. Section 1 of the Restatement (First) of Restitution provides that a "person who has been unjustly enriched at the expense of another is required to make restitution to the other." Under Comment (a) to Section 1, the Restatement further explains that a "person is enriched if he has received a benefit. A person is unjustly enriched if the retention of the benefit would be unjust." Finally, Comment (b) provides that a "person confers a benefit upon another if he gives to the other possession of or some interest in money, land, chattels, or chooses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage." Taken together, the Restatement sets forth a four-part test for claims of unjust enrichment: (1) the unjust; (2) retention of; (3) a benefit received: (4) at the expense of another.[40]

---

**39.** In their papers supporting class certification, Indirect Purchaser Plaintiffs never succinctly set forth their proposed common proof on impact. However, reading the relevant submissions and exhibits in their entirety, it is apparent that the factual demonstrations listed above are the primary sources of Indirect Purchaser Plaintiffs'

proposed "generalized evidence" to prove impact.

**40.** The standards for evaluating each of the various states classes' unjust enrichment claims are virtually identical. Courts have recognized that

Indirect Purchaser Plaintiffs have proffered common evidence that will be used to establish all of the class members' unjust enrichment claims. Indirect Purchaser Plaintiffs posit that all class members' proof will boil down to the common issues of whether: (1) Abbott's invalid patents and agreements with Geneva delayed generic competition; (2) such delay in generic competition enriched Abbott and/or Geneva to a greater extent than if there had been no such delay; (3) such additional profit came at the expense of end-payers; and (4) Abbott, as a matter of equity, should be required to return the excess profits to the end-payers. *See* DE–1021 at p. 13. Indeed, the same common operative facts that form the basis for each of the state classes' antitrust claims forms the basis for the unjust enrichment claims.[41]

According to Indirect Purchaser Plaintiffs, proof of the conferral of a benefit on Defendants will be established through testimony of participants in the pharmaceutical distribution chain that Abbott's profits from Hytrin were directly attributable to consumer and third-party payer purchases. *See* IPPs' Pre–Argument Submission, at p. 21. Once conferral of a benefit is established, Indirect Purchaser Plaintiffs will demonstrate, through common evidence from Dr. Hartman, the amount of excess profits that Abbott reaped because of its allegedly invalid patents and its alleged efforts to block generic competition. As is the nature of unjust enrichment claims, this common evidence will focus on the defendant's gain and not on the plaintiff's loss. Accordingly, it is evident that success or failure in proving this unjust enrichment claim will mean success or failure for the class as a whole, not for individual class members. *See In re Cardizem,* 200 F.R.D. at 352. Therefore, the Rule 23(b)(3) analysis has been met.

### c. Common Proof of Damages

In addition to showing class-wide injury as a result of Defendant's conduct, Indirect Purchaser Plaintiffs must show that computation of class-wide damages (or the quantum of injury) is susceptible to common proof. *Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 692 (N.D.Ga.1991). "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." *In re Cardizem CD Antitrust Litig.,* 200 F.R.D. 326, 348 (E.D.Mich. 2001) (citing *In re Potash Antitrust Litig.,* 159 F.R.D. at 697). Plaintiffs do not need to supply a precise damage formula at the certification stage of an antitrust action. Instead, in assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." *Id.* At the class certification stage, therefore, Indirect Purchaser Plaintiffs need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis.

state claims of unjust enrichment "are universally recognized causes of action that are materially the same throughout the United States." *Singer v. AT & T Corp.,* 185 F.R.D. 681, 692 (S.D.Fla. 1998) (citing *Sollenbarger v. Mountain States Tel. & Tel. Co.,* 121 F.R.D. 417, 428 (D.N.M.1988)). In fact, courts in Alabama, California, Illinois, Kansas, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, West Virginia, and Wisconsin have expressly followed or cited with approval the Restatement's definition of unjust enrichment. *See* IPPs' Mot. at p. 19, n. 11. While Florida, Maine and South Dakota do not cite the Restatement, the elements of an unjust enrichment claim in those states mirror those of the Restatement, only adding the additional element of "realization," "appreciation," or some kind of knowledge on the part of the Defendants of the conferral of the benefit by the Plaintiff. *Id.* at pp. 19–20 (citing Florida, Maine and South Dakota appellate decisions interpreting the unjust

enrichment standard). Because Indirect Purchaser Plaintiffs have indicated that they will present common evidence establishing this additional "appreciation" element, the absence of such a requirement under the Restatement (and the law of the states that follow it) presents no obstacle to class certification.

**41.** Indirect Purchaser Plaintiffs have explained the evidentiary link between their antitrust and unjust enrichment claims as such: "All of the Classes' claims allege that Abbott's illegal conduct created an exclusionary, anti-competitive market for the sale of terazosin and that as a result, Plaintiffs paid too much for their prescriptions. Defendants were unjustly enriched by the illegal overcharges and equity requires disgorgement for the benefit of the Plaintiffs and the members of each of the state Classes." *See* IPPs' Mot. at p. 45.

Upon review of the detailed reports that Indirect Purchaser Plaintiffs' damages expert, Dr. Raymond S. Hartman, submitted in connection with the class certification motions, the Court concludes that Indirect Purchaser Plaintiffs have proffered reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members on both the antitrust and unjust enrichment claims. Specifically, Dr. Hartman proposes application of a "before-and-after" regression analysis to calculate the impact of delayed generic entry, buttressed by a secondary analysis using the yardstick model.[42] *See* Defs.' Opp'n, at Exhibits 39–40. These economic methods are widely accepted and have been used in numerous other antitrust class actions. *See In re Cardizem,* 200 F.R.D. at 348–49; *see also In re NASDAQ,* 169 F.R.D. at 521. Furthermore, the methodologies are common to the class, and their validity "will be adjudicated at trial based upon economic theory, data sources, and statistical techniques that are entirely common to the class." *In re NASDAQ,* 169 F.R.D. at 521. And, as explained by Dr. Hartman and by Indirect Purchaser Plaintiffs at the March 12, 2004 oral argument, these methodologies apply equally to the antitrust claims as to the unjust enrichment claims. The only difference in their application stems from different assumptions upon which the calculations are based.

While Defendants complain that Dr. Hartman's methodologies are too imprecise for class certification, and further object to many of the underlying assumptions upon which his calculations are based, such contentions cannot defeat class certification. As noted above, for class certification purposes, plaintiffs need not supply a precise damage formula and the Court need not decide which approach is best-suited to the particularities of this case. "It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility" to deal with the individual damages issues that may develop.[43] *Id.* at 522.

Further, Defendants' challenges to Dr. Hartman's methodologies are concerns that relate primarily to the allocation of damages among individual class members, not to the computation of aggregate damages on a class-wide basis. Assuming the jury renders an aggregate judgment, allocation will become an intra-class matter accomplished pursuant to a court-approved plan of allocation, and such individual damages allocation issues are insufficient to defeat class certification. *See In re Potash,* 159 F.R.D. at 697 ("The amount of damages largely involves individualized questions. This is typically true in antitrust class actions, however, and does not preclude certification."). Indirect Purchaser Plaintiffs need only show that the proof they will utilize is sufficiently generalized in nature that "the class action will provide a tremendous savings of time and effort" to the Court. Based on the analyses offered by Dr. Hartman, the Court is satisfied that Indirect Purchaser Plaintiffs have sufficiently demonstrated that common issues relating to Defendants' liability, in the aggregate, predominate over potential individual damage issues.

**42.** As part of this analysis, Dr. Hartman calculates the actual price of Hytrin minus the "but-for" price absent the illegal conduct, times the quantity that would have been purchased absent the illegal conduct. Using this formula, Dr. Hartman determines: (1) the but-for penetration rate of generic terazosin during the relevant period; (2) the but-for prices of Hytrin and generic terazosin; and (3) the price differential between actual Hytrin prices and the but-for price of its AB-rated generic bioequivalent during the class period. Dr. Hartman has determined each of these inputs and calculated actual damages, with data covering a sufficient number of transactions so as to be scientifically accurate. Dr. Hartman has also factored into his calculations the necessary variations in the industry, such as pricing and substitution rates.

**43.** Both Rule 23(c)(1)(C), which allows for the amendment of class certification orders at any time before final judgment, and Rule 23(d), which authorizes courts to make appropriate orders to facilitate class action proceedings, provide ample avenues for the Court to deal with any potential difficulties associated with damage allocations as they may arise. In addition, while the Court acknowledges that this case has progressed further than most cases prior to the class certification ruling, the temporal proximity to trial does not mandate that the Court select a definite damages methodology, particularly in advance of any *Daubert* proceedings.

## 2. Superiority of Class Action Mechanism

■ Rule 23(b)(3) requires that the Court determine that the class action device is superior to other available methods for the fair and efficient adjudication of these controversies. Factors to be considered as part of this analysis include: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. *See* Fed.R.Civ.P. 23(b)(3). Considering these factors, it is clear that a class action is the superior method for the fair and efficient adjudication of this controversy.

The class action mechanism offers substantial economies of time, effort, and expense for the litigants in this matter, as well as for the Court. Indeed, Indirect Purchaser Plaintiffs' "conservative" estimate of the number of potential class members demonstrates the superiority of the class mechanism. Multiple lawsuits brought by thousands of consumers and third-party payers in seventeen different states would be costly, inefficient, and would burden the court system. *See In re Cardizem*, 200 F.R.D. at 351 (citing *In re NASDAQ*, 169 F.R.D. at 527).

Further, as to the consumer class members, the class action device is particularly appropriate where, as here, it is necessary to "permit the plaintiffs to pool claims which would be uneconomical to litigate individual-ly." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985);[44] *see also In re NASDAQ*, 169 F.R.D. at 527 (noting that "the exclusion of class members who cannot afford separate representation would be neither 'fair' nor an 'adjudication' of their claims"). If not for the class mechanism, consumers who purchased Hytrin for only a short period of time, but who nonetheless suffered an injury based on Defendants' alleged anticompetitive conduct, would be effectively left without any reasonable means of recovering their damages. *See Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 29 (D.Mass.2003) (recognizing that absent the class action mechanism, "the litigation costs, including extensive scientific expert analysis, of pursuing individual claims ... would be likely, in many cases, to be prohibitive."). And while the third-party payer class members may be financially able to assert their own claims in separate actions, the fact that the same allegedly anticompetitive conduct gives rise to each class member's economic injury makes it highly desirable to concentrate litigation of their claims in this forum. *See In re Synthroid Marketing Litig.*, 188 F.R.D. 295, 295–96 (N.D.Ill.1999).

Defendants argue that the proposed classes are unmanageable because: (1) they would require countless individualized analyses of choice of law questions;[45] (2) substantial variations exist in the individual state unjust enrichment laws; and (3) Indirect Purchaser Plaintiffs' proposed methodologies for determining damages are unworkable. These manageability arguments, however, assume that individual rather than common issues predominate as to both the fact of injury and the quantum of injury.[46] As the

---

**44.** *See also Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (noting that "where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device.").

**45.** In particular, the Court finds Indirect Purchaser Plaintiffs' response to this argument particularly persuasive. Indirect Purchaser Plaintiffs point out that they "are not seeking to apply a single state's law to a nationwide, or even a multistate, class of purchasers, but rather to apply state law to separate state classes that include those persons who purchased Hytrin in each state." *See* IPPs' Reply, at p. 24. Therefore, each state's substantive antitrust law will apply to that particular state class' claims. As addressed in Section III.C.1 above, this does not pose a manageability problem because the applicable substantive laws are virtually identical in their required elements.

**46.** In addressing manageability arguments similar to those that Defendants assert, the Southern District of New York noted that "if individual

Court has already concluded, the common issues, and not the individual question, are the ones that predominate. *See supra* Section III.C.1. Further, this position is in stark contrast to the arguments Defendants advanced before state courts in California and New York.[47] And finally, despite their many objections to the class action mechanism, Defendants have failed to suggest any superior alternatives.

In reaching this conclusion, the Court acknowledges that management of the several state classes will raise numerous challenges. However, these challenges are ones that routinely arise in complex litigation, and they are insufficient to overcome the innumerable advantages that class treatment will afford. Further, Indirect Purchaser Plaintiffs have presented the Court with compelling arguments demonstrating the manageability of the classes, particularly in light of the common evidence that will be used to prove Defendants' alleged illegal conduct. Accordingly, the Court finds that the superiority requirement of Rule 23(b)(3) has been satisfied.

### D. Appointment of Class Counsel Under Rule 23(g)(1)

On June 6, 2000, the Court designated the firms of Lowey Dannenberg Bemporad & Selinger, P.C. ("LDBS") and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") as co-Lead Counsel for the Indirect Purchaser Plaintiffs. *See* [DE–110] at ¶ 5. The law firm of Gauthier, Downing, LaBerre, Beiser & Dean was also added as additional Co-Lead Counsel on August 25, 2000, but was ultimately replaced by Wallace, Jordan, Ratliff & Brandt, LLC ("WJRB")[48] on February 18, 2004 [DE–1072].

While these firms have been acting on behalf of the proposed Indirect Purchaser Classes as interim counsel, pending a final decision on class certification, the Court must now formally appoint class counsel to represent the certified Indirect Purchaser Classes for the remainder of these proceedings. Pursuant to the amendments to Rule 23 that took effect on December 1, 2003, the Court, in making this appointment, must consider: (1) the work counsel has done in identifying or investigating potential claims in this action; (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in this action; (3) counsel's knowledge of the applicable law; and (4) the resources counsel will commit to representing the class. *See* Fed.R.Civ.P. 23(g)(1)(C)(I). The Court may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class and may, if it deems it

---

damage questions were a barrier to class certification, there would be little if any place for the class action device in the adjudication of antitrust claims." *In re NASDAQ*, 169 F.R.D. at 524. In the event that complications in calculating damages arise, the court in *Cardizem* has suggested three solutions for remedying the problem: (1) the Court could alter or amend its class certification order under Rule 23(c)(1); (2) the Court could bifurcate the liability and damages phases of the litigation, and only allow the action to proceed as a class for liability purposes; and (3) the Court could appoint a special master or a magistrate judge to assist in calculating damages. *See In re Cardizem*, 200 F.R.D. at 351 (citing *Little Caesar Enterprises, Inc. v. Smith*, 172 F.R.D. 236, (E.D.Mich.1997)). All of these options are similarly available to this Court should complications arise.

**47.** As pointed out by Indirect Purchaser Plaintiffs, Defendants successfully stayed other individual and class cases in various state courts pending the outcome of the state law claims now before this Court. *See* DE–1021 at pp. 14–15. In support of their motions to stay, Defendants contradicted their current position, arguing that this Court is the superior forum to resolve all of the state law claims. For instance, in *Daniels v. Abbott Lab., et al.*, Case No. 00CC04975 (Cal.), Defendants acknowledged that this Court "is uniquely positioned to reach a comprehensive and appropriate resolution of this nationwide dispute that adequately accounts for the interests of all concerned and avoids inconsistent or duplicative judgments." In another related state court case, *Asher v. Abbott Laboratories, et al.*, 307 A.D.2d 211, 763 N.Y.S.2d 555 (1st Dep't 2003), the New York appellate court, responding to Defendants' request to stay, agreed that this "federal action will result in a more complete disposition of the basic antitrust issues alleged." *Id.* Therefore, Defendants have, in essence, conceded that this class action is the superior mechanism for adjudicating these disputes.

**48.** Although WJRB was only appointed as Co-Lead Counsel on February 18, 2004, the Court notes that the firm had previously been an active member of the Executive Committee on behalf of the end-payer classes.

necessary, direct the proposed class counsel to provide information on any subject pertinent to the appointment. *See* Fed.R.Civ.P. 23(g)(1)(C)(ii)-(iii).

To comply with this recent amendment to Rule 23, the Court, on February 9, 2004, directed Indirect Purchaser Plaintiffs to provide supplemental information regarding proposed class counsel.[49] In their response to the Court's query, Indirect Purchaser Plaintiffs have detailed the work performed by class counsel LDBS, CMHT and WJRB. Specifically, Indirect Purchaser Plaintiffs note that Co–Lead Counsel have explored every avenue of recovery on behalf of the end payer classes, including several claims that this Court has dismissed. *See* IPPs' Pre-Argument Submission on Class Certification, at p. 23. Co–Lead Counsel's efforts have included reviewing millions of pages of documents, taking depositions around the country, surviving several motions to dismiss, and prosecuting the class certification motions. *Id.* In so doing, Co–Lead Counsel has committed substantial resources to representing the classes, already spending approximately $1,000,000 in prosecuting this action, and will continue to bear substantial expenses to represent the Indirect Purchaser Classes. *Id.* at pp. 23–24.

The consideration that the Court finds to be most persuasive, however, relates to Co–Lead Counsel's experience in, and knowledge of, the applicable law in this field. As noted in the firm resumes of LDBS, CMHT, and WJRB, as well as the individual resumes of the firms' members, Co–Lead Counsel have extensive experience in the antitrust and complex litigation fields. For example, LDBS served as co-lead counsel for end payers in the *In re Cardizem* case in Michigan and CMHT was co-lead counsel for end payers in the *Buspirone* litigation in New York, among many others.[50] *Id.* at Tab N. The Court also notes that Co–Lead Counsel have considerable trial experience in complex litigation matters. *Id.* Based on the Court's observations of Co–Lead Counsel, a review of their resumes, and the absence of any argument by Defendants disputing the qualifications of counsel, the Court must conclude that Co–Lead Counsel have fairly and adequately represented the interests of the end-payer classes to date, and expects that they will continue to do so. Accordingly, LDBS, CMHT, and WJRB are appointed as class counsel to represent the certified Indirect Purchaser Classes for the remainder of these proceedings.

## IV. Conclusion

For the reasons expressed in the foregoing opinion, it is hereby

ORDERED that:

(1) The Indirect Purchaser Plaintiffs' Motions for Class Certification of a State–Wide Class of End–Payers are GRANTED in: Alabama [DE–453], California [DE–452], Florida [DE–450], Illinois [DE–464], Kansas [DE–463], Maine [DE–462], Michigan [DE–461], Minnesota [DE–460], Mississippi [DE–459], Nevada [DE–458], New Mexico [DE–455], New York [DE–456], North Carolina [DE–454], North Dakota [DE–465], South Dakota [DE–466], West Virginia [DE–467], and Wisconsin [DE–468][51];

(2) The Indirect Purchaser Plaintiffs' Motion for Class Certification of a State–Wide Class of End–Payers in the District of Columbia [DE–451] is DENIED;

(3) The Indirect Purchaser Plaintiffs' Motion for Class Certification of a State–Wide

---

**49.** Specifically, the Court's Order [DE–1055] required Indirect Purchaser Plaintiffs to submit additional information regarding the work proposed class counsel has done in this case, counsel's knowledge of the applicable law (and particularly, the law as to damage calculation involving third-party payers of ultimate consumer drug costs), the resources counsel will commit to representing the class, and counsel's proposed terms as to attorneys fees and nontaxable costs.

**50.** While Indirect Purchaser Plaintiffs have not provided a list of cases in which Co–Lead Counsel WJRB participated, the Court notes that members of that firm have experience as lead counsel to several Blue Cross and Blue Shield plans in national mass tort litigation, including proceedings involving breast implants and fenphen.

**51.** The class representatives for each state class of end-payers are identified in Section III.A., *supra.*

Class of End–Payers in New Jersey [DE–457] is DENIED AS MOOT, in light of the Court's dismissal of the New Jersey indirect purchasers claims in its September 11, 2002 Order [DE–873];

(4) In those states where the Court is granting the motions for certification of a state-wide class of end-payers, the definition of the classes shall be as follows:

All persons and entities who or which have at any time from October 15, 1995 to June 30, 2002, paid all or part of the purchase price of Hytrin or its AB-rated generic bioequivalents other than for resale, in [state] or via mail for residents of [state]. Excluded from the Class are the Defendants, their officers and directors, their direct and indirect parent and subsidiary corporations and their officers and directors; government entities; entities that purchased Hytrin and its generic bioequivalents for resale, to the extent of such purchases for resale; direct purchasers of Hytrin and its generic bioequivalents from Defendants, to the extent of such direct purchases; and indirect purchasers who suffered no economic injury as a result of Defendants' allegedly unlawful conduct.

(4) These determinations are conditional and may be modified prior to the decision on the merits in light of any changes in the circumstances that make such modification advisable. *See* Fed.R.Civ.P. 23(c)(1).